UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT EDWARD STECKROTH, II
                        Plaintiff,              Case No.: 11-cv-10473
                                                Honorable Thomas L. Ludington
v.                                              Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                        Defendant.
_____/


## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 14]

Plaintiff Robert Steckroth brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.      RECOMMENDATION

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that Steckroth maintains the residual functional capacity ("RFC") to engage in his prior work as a pizza delivery person. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Steckroth's motion [11] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.     **Procedural History**

On June 21, 2006, Steckroth filed an application for DIB, alleging disability as of December 31, 2002. (Tr. 118-123).  The claim was denied initially on November 3, 2006.  (Tr. 76-80).  Thereafter, Steckroth filed a timely request for an administrative hearing, which was held on February 24, 2009, before ALJ Terry Miller.  (Tr. 33-72).  Steckroth, represented by attorney Laurie Sadhnick, testified, as did Steckroth's mother, Jeri Ann Steckroth, and vocational expert ("VE") Amy Kushbob.  (*Id.*).  On June 23, 2009, the ALJ found that Steckroth was not disabled.  (Tr. 20-32).  On December 9, 2010, the Appeals Council denied review.  (Tr. 1-4). Plaintiff filed for judicial review of the final decision on February 7, 2011. [1].

B.     **Background**

While the ALJ determined that Steckroth suffered from three severe impairments: paranoid schizophrenia, attention deficit hyperactivity disorder and a history of alcohol abuse, Steckroth's motion challenges only the ALJ's findings and analysis related to his paranoid schizophrenia.  Thus, the court will focus only on the background relevant to that condition.

1.     *Disability Reports*

In a disability function report filed on June 21, 2006, Steckroth alleged that the following conditions prevented him from maintaining employment: paranoid schizophrenia and Tourette's syndrome.  (Tr. 165).  He reported that he was paranoid that people were "out to get" him, or that his food was "being poisoned."  (*Id.*).  He also reported that he had to "figure out 'good' and 'bad' voices."  (*Id.*).  He reported that co-workers were "jealous of [him] because [he] know[s] so much more than they do," and that bosses would fire him because his co-workers did not like him.  (*Id.*).  Steckroth reported having started "at least 11 jobs in 2005" and that his jobs "never

lasted more than a few days to weeks." (*Id.*).  He reported being treating with Risperdal injections for his schizophrenia.  (Tr. 169).

In a function report dated September 8, 2006, Steckroth reported that he lived with his family in a house and that his daily activities consisted of playing on the computer, pulling weeds out of the garden, watching television and preparing food.  (Tr. 172-73).  He would perform numerous chores such as washing dishes, vacuuming, cleaning his room and cleaning the basement, although he needed daily reminders to do these things.  (Tr. 173-74).  He also attended church and performed community service on a horse farm.  (Tr. 176).  He reported being able to go out alone, although at the time he did not drive because, he reported, he did not "have a working car."  (Tr. 175).  However, he also reported needing someone to accompany him when he went out.  (Tr. 176).  Steckroth reported being unable to pay bills, handle a savings or checking account, though he could count change.  (*Id.*).  He reported needing to be reminded to take his medication.  (Tr. 174).  He reported having difficulty talking, hearing, concentrating and following instructions, elaborating, "It is hard to communicate with people."  (Tr. 177).  He reported that he had been fired or laid off because of problems he had with other people, stating "It is hard to keep a job."  (Tr. 178).

In a work history report filed by Steckroth's mother and guardian, Jeri Steckroth, she confirmed that Steckroth had eleven jobs in 2005, stating that "most jobs were very short lived," and that Steckroth "just can't hold a job for any period of time."  (Tr. 187).  In a third-party function reported filed the same day, Jeri Steckroth confirmed most of what Steckroth himself had reported.  (Tr. 188-95).  In addition, she reported that he was noncompliant with oral medication and received injections as a result.  (Tr. 190).  She reported that he could go out alone, and that he did drive, in addition to walk.  (Tr. 191).  She reported that Steckroth tended

3

not to finish what he started, and that his illness has affected his transition to adulthood, including his social life. (Tr. 192). She reported he had no friends, cannot take instruction well, and is "very impulsive and unrealistic." (Tr. 193). She reported in addition to paranoia, Steckroth suffered from auditory hallucinations and delusions of grandeur. (Tr. 194). Jeri Steckroth reported that she and her husband had been appointed guardians of Steckroth "because [he] is unable to care for himself." (Tr. 195).

In a disability appeals report filed on April 3, 2007, Steckroth noted that he was receiving therapy for his condition. (Tr. 201-202). He reported that while he is able to care for his "activities of daily living," he "cannot support [himself] or maintain living quarters," stating that his parents support and care for him. (Tr. 203).

2.    *Plaintiff's Testimony*

Steckroth testified that he has always lived with his parents. (Tr. 39). He had a license and was able to drive and go places by himself. (Tr. 59). He completed a GED in 2000 and since had been taking college courses on and off in computers, welding, heating and cooling, and math. (Tr. 39-40). He obtained mostly Bs and Cs in his courses. (Tr. 41). Steckroth testified that he helped around the house, including indoor and outdoor chores. (Tr. 59). He no longer maintained a bank account because he had been the victim of a Nigerian check scam and owed "everyone." (Tr. 59-60). He attended church with his parents weekly, but did not engage in the church community or any other social community outside of services. (Tr. 60).

Steckroth testified he was diagnosed with paranoid schizophrenia, which resulted in him having to "live life constantly battling [him]self, screaming at [him]self." (Tr. 46). He testified that he would drift of in the middle of a task, or have difficulty getting motivated. (*Id.*). Steckroth testified that his mother gives him Risperdal injections every two weeks, a medication

4

prescribed by his psychiatrist.  (Tr. 47).  He testified that he had seen two different psychiatrists, Dr. Haque and Dr. Campbell, but that who he "really" saw was his therapist, John Roberts.  (Tr. 48).  He had previously been discharged from treatment when Roberts felt that he was getting better, but then returned to therapy because his mother "felt [he] needed to go back."  (Tr. 48-49).  Although Steckroth testified that "it's hard for [him] to go to therapy," he answered "yes" when asked whether seeing Roberts helped him have a better outlook.  (Tr. 49).  Steckroth testified that he had a hard time around other people because he tended to get paranoid; he felt like he was being poisoned and was always looking over his shoulder.  (Tr. 49; 51).  He testified having one friend from work, who he sees and speaks to on a regular basis, and another friend, who he had known since he was a teenager, who he saw a couple of times a month.  (Tr. 50; 58).  He testified that he did not engage in any activities with either of these friends, however.  (Tr. 51).  When he was not working, he regularly watched television, played on the computer and talked to himself.  (Tr. 54).  He did not read because his mind would "be hearing things" and "it's hard to focus."  (Tr. 56).

Steckroth testified that he had auditory hallucinations, and that when he went to bed it was sometimes "kind of scary, loud and scary every now and then."  (Tr. 56).  He testified he had accepted the voices as part of his life and that he did not hear them all the time, though recently he had been experiencing panic attacks and voices telling him he was going to die.  (Tr. 57).  When the voices were bad, they sounded like 'constant gibberish all day" making him want to "strangle some imaginary thing."  (Tr. 58).

Steckroth testified that at the time of the hearing he was working about eight hours a week delivering pizzas.  (*Id.*).  He worked a couple of days a week for two to three hours a day.  (Tr. 54).  Steckroth testified that he had no trouble finding the homes of his customers or

engaging in the financial transaction related to the sale. (*Id.*). He testified that the reason he had had a number of jobs was the he felt people would turn on him or he would get paranoid and stop trusting people. (Tr. 42). Steckroth testified that he usually quit his jobs. (*Id.*).

> 3. *Plaintiff's Mother's Testimony*

Steckroth's mother, Jeri, testified that she had been Steckroth's legal guardian for almost three years and that she was not planning on giving up guardianship. (Tr. 63). She testified that she made sure Steckroth did his homework and went to his therapy appointments. (Tr. 63-64). She attended appointments periodically. (Tr. 64). She made sure he was neat and clean because he was often disheveled and disorganized. (*Id.*). Jeri Steckroth and her husband attended some of Steckroth's college classes "to get him on track" as he "seemed to do better and more consistent with us there." (*Id.*). She testified that she did not, however, take Steckroth to his current job as a pizza deliverer, as "he's been on medication." (*Id.*). Prior to the medication, she would take him to and from his jobs, and when he lost jobs she would find out why he was let go. (*Id.*). She testified that Steckroth had been fired from "many, many, many jobs." (*Id.*).

Jeri Steckroth testified that Steckroth did not engage with his therapist and, at one point, his therapist felt that he had helped Steckroth all he could and suggested terminating therapy, to which Jeri Steckroth agreed. (Tr. 65). However, she later felt he needed continued therapy after he began experiencing paranoia that he was dying. (Tr. 65-66). She also testified that Steckroth experiences a paranoia that people are poisoning him. (Tr. 66). She testified that Steckroth did not want to be in therapy. (*Id.*).

Jeri Steckroth testified that Steckroth was able to go out by himself, but that she did not know what he did when he went out. (Tr. 68). She testified that without his parents, he would likely be homeless. (*Id.*).

6

4.      *Medical Evidence*

a.      *Treating Sources*

Steckroth was first examined by the Oakland Psychological Clinic in February 2006.  (Tr. 230-36).  At the time he was assessed with a global assessment of functioning ("GAF") score of 40, meaning he demonstrated some difficulty in reality testing or communication or he had a major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  (Tr. 233); s*ee* DSM-IV-TR, at 34 (July 2000).  The examiner, therapist Nancy Wrobel, found that Steckroth had difficulty with impulse control, and impaired insight and judgment and that these things interfered with his daily activities, for example, employment.  (Tr. 231; 233).  She diagnosed him with ADHD and Tourette's, but noted that he needed to complete a psychiatric evaluation and psychological testing.   (Tr. 234-35).   In her full psychological evaluation, Wrobel noted that Steckroth reported delusions of persecution and auditory hallucinations, which sometimes included commands.  (Tr. 420).   Wrobel determined that Steckroth had difficulty concentrating, and his wide ranging achievement test scores revealed a wide discrepancy between reading and math, with reading at a high school level and math at a sixth grade level.  (Tr. 420).  She noted that on his Minnesota Multiphasic Personal Inventory test ("MMPI-2") he tendered deviant responses; admitting to serious psychological problems while at the same time naively attempting to appear well adjusted.  (*Id.*).   She noted that individuals with similar profiles had difficulty with interpersonal relationships and were unlikely to cooperate in therapy.  (Tr. 420-421).

Psychological testing revealed paranoid ideation and auditory hallucinations, and Wrobel referred Steckroth to Dr. Haque, a psychiatrist, for an evaluation.  (Tr. 268).  On April 6, 2006, Dr. Haque diagnosed him with paranoid schizophrenia and started him in Abilify.  (Tr. 265-67).

At his next appointment, on April 20, 2006, Dr. Haque noted that Steckroth had quit his pills a few days after starting treatment, alleging that the voices began screaming at him. (Tr. 264). Dr. Haque increased Steckroth's Abilify dosage. (*Id.*). On that same date, Dr. Haque wrote a "To Whom It May Concern" letter regarding Steckroth's condition. (Tr. 417). Dr. Haque noted Steckroth's history and his symptoms, and stated "[h]is prognosis for recovery from this condition is extremely guarded due to the pervasive and chronic nature of his condition." (*Id.*). He certified, via a form, that Steckroth was permanently disabled in that his condition prevented him from engaging in substantial gainful activity. (Tr. 418). At an appointment on May 3, 2006, Steckroth reported taking the Abilify for a week and quitting again, stating that he felt well and did not need the medication. (Tr. 262). Dr. Haque changed his medication to Risperdal injections once every two weeks. (*Id.*).

At an appointment on June 14, 2006, Dr. Haque noted Steckroth had taken two injections so far, and that his mother had reported Steckroth was less anxious. At an appointment on August 9, 2006, Steckroth reported feeling "okay" on the medication, except that he got tired. (Tr. 250). At an October 11, 2006, appointment, Steckroth reported no new symptoms, and that he was able to focus on his new job as a machine operator. (Tr. 241). Jeri Steckroth also reported not having seen any psychosis. (*Id.*). At an appointment on January 31, 2007, Jeri Steckroth reported that her son was "doing very well." (Tr. 329). At that point, Steckroth again denied any auditory hallucinations. (*Id.*). Dr. Haque continued the Risperdal. At an appointment on March 24, 2007, Steckroth denied having auditory hallucinations, and reported that his mood was stable and that he was sleeping well. (Tr. 326). Dr. Haque described Steckroth's progress toward his goals as "fair." (*Id.*). At an appointment on May 19, 2007, Steckroth reported feeling well, with no hallucinations and that he was getting along with his co-

workers at his new job at a newspaper plant. (Tr. 322). Dr. Haque noted Steckroth's progress as "good." (*Id.*). Steckroth stopped seeing Dr. Haque in August 2007, after his mother began getting his medication from the family's primary care physician. (Tr. 317).

Steckroth was next evaluated by psychiatrist Dr. Lisa Campbell in November 2008, after his therapy case was reopened. (Tr. 299). Dr. Campbell noted that Steckroth had been taking his Risperdal injections every two weeks. (Tr. 297). She noted he was still hearing voices, but that he reported them as "mostly cheerful" thoughts which he did not mind, that they were part of his life so he did not feel bothered by them, however. he still felt that people were "out to get" him. (Tr. 296). Dr. Campbell found Steckroth to be "a good natured, occasionally smiling, spontaneous, open young adult," and noted unremarkable psychomotor behavior and no suicidal or homicidal ideation. (Tr. 297). However, she found his memory and insight to be poor. (*Id.*). She assessed him a GAF score of 52 and gave him a "guarded" prognosis. (Tr. 298).

At an appointment on November 17, 2008 Steckroth reported having hallucinations, but that they were not bothersome. (Tr. 294). Dr. Campbell noted satisfactory progress. (*Id.*). On that same day, Dr. Campbell wrote a letter to Steckroth's primary care physician, Dr. Learner, noting that Steckroth was "an earnest, cooperative young man, who admits to having hallucinated voices, mostly cheerful and not at all troubling." (Tr. 408). She felt that the Risperdal was keeping Steckroth "in good control" and that she did not feel a need to continue treatment as Dr. Learner was "treating him quite properly." (*Id.*). At the final appointment in the record, on December 15, 2008, Steckroth reported that his hallucinations were under control. (Tr. 290). She found him "open, rational, restrained, timid and eurythmic," and noted satisfactory progress. (*Id.*). However, in a letter to Steckroth's attorney dated February 4, 2009, Dr. Campbell recommended that Steckroth's "condition is severe enough to prevent him from

working, due to his hallucinations and paranoid state of mind." (Tr. 422). She did not provide any supporting statements or evidence for this opinion.

Therapist John Roberts began treating Steckroth in June 2006. (Tr. 255). At an appointment in July 2006, Steckroth denied recently having any auditory hallucinations. (Tr. 254). In the beginning, Roberts notes reflect ebbs and flows in Steckroth's condition, exhibited by Steckroth's reports of hearing voices and having delusional thoughts that Roberts concluded "continue to affect [his] occupational and social functioning. (Tr. 238; 244; 246; 249). At an appointment on October 19, 2006, Steckroth appeared with a "blustered affect;" he had a "starved look "and "gazed into the air. (Tr. 238). While he reported still hearing voices, he stated that there was a "significant improvement." (*Id.*).

The conversation in Steckroth's next two appointments with Roberts focused on Steckroth's work, or lack thereof. (Tr. 333; 335). However, notes from the next few appointments show a marked improvement in Steckroth's condition, with Roberts noting that he "continue[d] to improve" and that he was "not hearing voices". (Tr. 321; 324-25 327-28). At one point Roberts noted that he found Steckroth "rational and engaged." (Tr. 321). On June 6, 2007, Roberts spoke with Jeri Steckroth about closing her son's case "in the near future." (Tr. 320). At the time she was agreeable to this. (*Id.*). However, at the next appointment, on June 27, 2007, there appeared to be a setback in Steckroth's condition, with increased paranoia and other symptoms of psychosis, and thus therapy continued. (Tr. 319).

At the next session on August 1, 2007, Steckroth's mother was present and expressed concerns for her son's wellbeing. (Tr. 317). She felt that it would be beneficial to continue therapy. (*Id.*). Roberts noted that Steckroth appeared discouraged and had low self-esteem. (*Id.*). He concluded that Steckroth's "disorder influences [his] decisions and efforts toward life

10

events." (*Id.*). However, Roberts continued to note progress at the next few appointments and, after an appointment in February 2008, where Steckroth reported no psychoses and that he was doing well in college, Roberts again noted a desire to close his case (Tr. 307; 310-315). After speaking with Jeri Steckroth, on February 19, 2008, Roberts closed Steckroth's case, noting that "Risperdal injections have been very beneficial to help decrease hallucinations." (Tr. 306). Roberts found Steckroth "much improved." (*Id.*).

On October 28, 2008, Roberts reopened Steckroth's case, noting an uptick in paranoia and auditory hallucinations. (Tr. 301). Steckroth reported being afraid he was going to die. (*Id.*). Roberts assessed him and found that he had some denial issues regarding his diagnosis. (Tr. 302). However, he found him fully oriented, with a normal affect but a depressed mood, with impaired judgment and insight. (*Id.*). At an appointment on November 11, 2008, Steckroth reported hearing voices "every now and then" and that he was at counseling by choice. (Tr. 295). At an appointment on November 25, 2008, Steckroth reported getting through his college semester and that he had no hallucinations. (Tr. 293). He reported not wanting to be on medication. (*Id.*). Roberts noted that Steckroth had poor judgment regarding wanting to quit the medication. (*Id.*). At an appointment on December 9, 2008, Steckroth reported no hallucinations or delusions. (Tr. 291). At an appointment on December 16, 2008, Steckroth reported no hallucinations and Roberts noted he was pleasant and engaged during the session. (Tr. 289). Roberts found he had improved his responsibility and that Steckroth continued to see himself improve. (*Id.*).

Steckroth also produced treatment records from his primary care physician, Dr. James Learner, M.D., from May 2006 until January 2009. (Tr. 385-93). At first, Dr. Learner recorded some of Steckroth's paranoid schizophrenia symptoms and began administering Steckroth's

Risperdal injections in 2007. (Tr. 392-93). Steckroth reported that he was feeling great and happy and that the medicine was "great." (Tr. 392). As time went on, Dr. Learner recorded few symptoms, dealing mostly with Steckroth's physical complaints including a head cold and pain. (Tr. 388-91). Dr. Learner continued to prescribe Risperdal. (Tr. 385-93). Dr. Learner's nurse practitioner, Deborah Bailey, wrote a "To Who It May Concern" letter on February 12, 2009, stating that she had been caring for Steckroth since May 2006, and that his disability has interfered with his ability to sustain employment and support himself. (Tr. 424). She noted that Steckroth hears voices and believes people are trying to poison him, and that he also exhibits grandiose behavior. (*Id.*). She documented that Steckroth's mother was the reason he had gotten to work every day, as she woke him up and drove him. (*Id.*). Nurse Bailey concluded that Steckroth was unable to support himself and should be granted disability. (*Id.*).

b.      *Consultative and Non-Examining Sources*

Steckroth attended a consultative examination with Dr. John Jeter, a limited license psychologist and clinical social worker, on October 17, 2006. (Tr. 223-26). Dr. Jeter noted that Steckroth arrived for the appointment accompanied by his mother, who drove him. (Tr. 223). Steckroth reported auditory hallucinations about six times a day, but that his medication for his paranoid schizophrenia was "working very well." (Tr. 223; 225). He noted that, for the last two weeks, Steckroth had been working 36 hours a week "with success." (Tr. 225). Dr. Jeter found Steckroth's thoughts logical, organized, simple and concrete. (Tr. 225). He noted that Steckroth responded well to instructions and did not require them to be repeated. (Tr. 224). Eye contact was good, though Steckroth was minimally verbally responsive and guarded with his answers and his contact with reality was faulty. (*Id.*). Dr. Jeter noted that Steckroth's wide ranging aptitude test scores had increased since he was tested in March 2006. (Tr. 225). He found that

12

Steckroth "presented as stable" and his medication "appear[s] to be controlling his impulsive behavior."  (Tr. 226).  He assessed Steckroth with a GAF score of 62.  (*Id.*).

On November 2, 2006, Dr. Rom Kriauciunas, Ph.D., reviewed Steckroth's records to date and produced an RFC assessment.  Dr. Kriauciunas diagnosed Steckroth with paranoid schizophrenia, but found it well managed by medication.  (Tr. 273).  He determined that Steckroth had mild restriction in activities of daily living and moderate difficulties on maintaining social functioning and maintaining concentration, persistence and pace.  (Tr. 281).  He found that Steckroth suffered from one or two episodes of decompensation.  (*Id.*).  Dr. Kriauciunas labeled Steckroth as "moderately limited" in six out of twenty categories, including his ability to understand, remember and carry out detailed instructions, his ability to interact with the public and his ability respond appropriately to workplace changes.  (Tr. 285-86).  Based on this, he concluded Steckroth remained capable of performing unskilled work on a sustained basis.  (Tr. 287).

5.    *Vocational Expert's Testimony*

VE Amy Kushbob testified in response to a hypothetical that based on Steckroth's age, education, work history and RFC assessed by the ALJ which included no exertional limitations, but included limiting him to simple routine tasks consistent with unskilled work, only occasional interpersonal interactions with the general public, supervisors and co-workers, and only occasional changes in the work setting, that Steckroth could continue to perform his past relevant work as a pizza deliverer.  (Tr. 70).  Other jobs that would fit this hypothetical would include dining room attendant, kitchen helper, and laundry worker. (Tr. 71).  The ALJ then asked the VE to include the additional limitation of an inability to sustain even simple routine tasks on a consistent basis due to interruptions from psychologically-based symptoms, namely auditory

13

1:11-cv-10473-TLL-DRG   Doc # 17   Filed 03/02/12   Pg 14 of 25   Pg ID 535

hallucinations. (*Id.*).  The VE testified that such a limitation would preclude both past work and other work.  (*Id.*).

        *6.    Other*

In his appeal of the ALJ's decision to the Appeals Council, Steckroth included a letter, dated September 29, 2010 from his former general manager at Marco's Pizza, the job he had held at the time of the ALJ hearing.  (Doc. # 11, Exh. 1).[1]  The general manager wrote that Steckroth's employment with the company "stopped some time ago, due to his inability to successfully perform the duties required of a delivery person, even on a part time basis."  (*Id.*).

## C.    **Framework for Disability Determinations**

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the

---

[1] Though Steckroth alleges he attached this letter to his Appeals Council appeal, a copy of it does not appear in the record.  The Commissioner, however, does not dispute that it was attached to Steckroth's appeal.

severe impairment meets or equals one of the impairments listed in the
regulations, the claimant is conclusively presumed to be disabled regardless of
age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work,
benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if
other work exists in the national economy that plaintiff can perform, in view of
his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21

(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout

the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is

not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human*

*Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Steckroth was not disabled

because he was able to engage in his prior relevant work as a pizza deliverer.  (Tr. 30).  At Step

One, she found that Steckroth had not engaged in substantial gainful activity since December 31,

2002.  (Tr. 25).  At Step Two, she determined that Steckroth's severe impairments included

paranoid schizophrenia, attention deficit hyperactivity disorder, and a history of alcohol abuse.

(Tr. 25).  At Step Three, she concluded that Steckroth's severe impairments, either alone or in

combination, did not meet or medically equal a listed impairment under either listing 12.03 or

12.08.  (Tr. 25-26).  She determined that Steckroth had mild restriction in activities of daily

living, moderate difficulties in social functioning and concentration, persistence and pace, and no

episodes of decompensation of extended duration.  (Tr. 26-27).  Next, the ALJ assessed

Steckroth's RFC.  She found he had the RFC to perform:

> a full range of work at all exertional levels but with the following
> nonexertional limitations: the claimant is limited to simple, routine,
> repetitive tasks consistent with unskilled work; with only occasional
> interpersonal interactions with the general public, co-workers, and
> supervisors; and only occasional changes in the work setting.

(Tr. 27). The ALJ then determined that Steckroth had worked as a pizza deliverer on a repeated basis within the last 15 years, long enough to learn the job's duties. (Tr. 30). Based on this RFC, coupled with his age, education and work history, the ALJ concluded Steckroth was capable of performing his past relevant work as a pizza deliverer and thus he was not disabled under the Act. (*Id.*).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide

16

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

## F.    Analysis

Steckroth alleges that the ALJ erred in not finding that his combination of impairments met or medically equaled a listed impairment. In addition, he argues that the ALJ committed legal error in assigning no weight to any of the three treating source's opinions that he is disabled, instead giving significant weight to the opinion and RFC assessment of the consulting physicians. Finally, Steckroth argues that the letter from Marco's pizza, submitted with his

Appeals Council appeal, should be considered new and material evidence, as it would likely have altered the ALJ's decision.

### 1. Meeting or Equaling a Listed Impairment

Steckroth first argues that substantial evidence does not support the ALJ's determination that his impairment did not meet or medically equal the listing 12.03, for paranoid schizophrenia. *See* 20 C.F.R. pt. 404, subpt. P, app.1 § 12.03 (1983). Steckroth bears the burden of proof that his impairments meet a particular listing. *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). To satisfy listing 12.03, a claimant must demonstrate a "medically documented persistence, either continuous or intermittent," of one of several different conditions, most relevant here "delusions or hallucinations." 20 C.F.R. pt. 40, subpt. P, appx 1 § 12.03(A) ("Subsection A") (1983). In addition, the condition must result in "marked"[2] restrictions or difficulties in at least two of the following three categories: (1) activities of daily living; (2) maintaining social functioning; and (3) maintaining concentration, persistence or pace, or marked restrictions or difficulties in one of them and "repeated episodes of decompensation, each of extended duration." *Id.*, § 12.03(B) (collectively, the "B Criteria," Doc. #11 at 9, fn. 2). If the claimant cannot satisfy Subsection A ***and*** the B Criteria, then he could still satisfy listing 12.03 under the criteria listed in subsection C. *Id.*, § 12.03(C). However, the ALJ found each of the subsection C criteria to be inapplicable. (Tr. 27). Steckroth only challenges the ALJ's findings that he failed to satisfy the Subsection B Criteria. Specifically, he argues that the ALJ erred in concluding that he only had "moderate" difficulties in social functioning and in concentration, persistence and pace and, instead, claims the evidence demonstrates he had "marked" difficulties in both categories, and thus he meets the listing. The court disagrees.

---

[2] "Marked" means "more than moderate but less than extreme." Id., § 12.00(C).

The ALJ carefully discussed his reasons for determining Steckroth only had "moderate" difficulties in these two areas. With regard to social functioning, the ALJ acknowledged that Steckroth testified to problems getting along with supervisors and co-workers and that he had paranoid thoughts that other people were poisoning him or heard voices telling him to do bad things to people. (Tr. 26). However, he also noted that Steckroth was capable of leaving home on a regular basis, he held jobs that involved some public contact, had a few friends and had been sexually active, went to church and took college classes. (*Id.*). Furthermore, he noted the medication had been reducing the severity of Steckroth's paranoia; therefore a moderate restriction was appropriate. (*Id.*).

Similarly, with regard to concentration, persistence and pace, the ALJ found that Steckroth's hallucinations, in addition to the ADHD he was diagnosed with as a child, made it difficult for him to concentrate. (*Id.*). He noted that Steckroth was a "little hyperactive and somewhat distractible" at the hearing, playing with his fingers during some of the testimony. (*Id.*). He noted that Steckroth's mother claimed a need to supervise him constantly, drive him places, and make sure he attended classes. (*Id.*). However, the ALJ also noted that treatment records indicate that Steckroth's hallucinations are no longer particularly bothersome, especially with the medication. (Tr. 26-27). In addition, Steckroth has been able to make passing or better grades in his college courses, while at the same time working part-time. (Tr. 27). Furthermore, Steckroth's mother testified that she did not drive him places since "he's been on medication." (Tr. 64). The ALJ found that the above evidence not rise to the level of a marked difficulty in concentration, persistence and pace. (Tr. 26). Furthermore, no physician, treating or otherwise, assessed Steckroth with marked limitations in any category. No treating physician completed such an evaluation, and consulting physician Dr. Kriauciunas assessed only mild and moderate

limitations synonymous with those assessed by the ALJ. (Tr. 281).

Based on the foregoing, the court finds that the ALJ's conclusions are supported by substantial evidence in the record.

### 2.     Treating Source Opinions

Steckroth argues that the ALJ committed legal error in giving no weight to three treating physician opinions that found him disabled; instead giving significant weight to the opinions of two consulting physicians, one of whom did not examine Steckroth and did not have the benefit of many of his records at the time of his assessment.

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines to give a treating physician's opinion controlling weight, he must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.  An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, however, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F. R. § 404.1527(e)(1), (e)(3).

20

Here, the ALJ gave good reasons for declining to give any weight to the three treating source opinions on Steckroth's disability. (Tr. 29-30). With regard to Dr. Haque's April 2006 opinion, the ALJ correctly noted that his opinion came when Steckroth's medication had not yet had a chance to be fully effective. (Tr. 29). Notably, Steckroth was not being compliant with his medication at the time Dr. Haque issued his opinion regarding disability, and he was not put on Risperdal, which proved effective for Steckroth, until after Dr. Haque issued his opinion. (Tr. 257-58; 417). In fact, Dr. Haque's later treatment records note that once Steckroth switched from oral Abilify to Risperdal injections, his symptoms began to dissipate, and at times seemed to disappear completely. (Tr. 241; 250; 322; 326; 329). Thus, the ALJ did not err in giving no weight to Dr. Haque's April 2006 opinion regarding Steckroth's disability.

Similarly, the ALJ gave no weight to Dr. Campbell's November 2009 opinion that Steckroth was disabled. (Tr. 30). The ALJ noted that Dr. Campbell did not support her conclusory statement with any explanation or evidence, and thus the ALJ had the right to disregard it. (*Id.*); s*ee e.g. Anderson v. Comm'r of Soc. Sec.*, 195 Fed Appx. 366, 370 (6th Cir. 2006) (approving ALJ's dismissal of conclusory treating physician opinion when unsupported by and inconsistent with treatment notes). In addition, Dr. Campbell began seeing Steckroth after a break in therapy, and it appears from the record that the break may have impacted the progress he had been making. (Tr. 30; 301-305). Furthermore, Dr. Campbell's treatment notes from around the same time contradict her letter. (Tr. 290; 294; 296-98). They note continued improvement in Steckroth's condition, consistent with his return to therapy, so much so that she proposed to his primary care physician, Dr. Learner, that her services were no longer needed, citing the fact that the medication was "keeping him in good control" and suggesting that Dr. Learner could handle Steckroth's case alone. (Tr. 408). In that same letter she stated she found

21

Steckroth to be "earnest" and "cooperative" and whose voices were "mostly cheerful and not at all troubling." (*Id.*). Dr. Campbell's characterization of Steckroth's condition, coupled with her belief that he no longer needed a psychiatrist is inconsistent with her conclusion that his condition was disabling. Therefore, the ALJ's decision not to credit Dr. Campbell's conclusory opinion finding Steckroth disabled is supported by substantial evidence.

Finally, the ALJ did not give any weight to Steckroth's primary care nurse practitioner Deborah Baily's assessment that Steckroth was disabled. The ALJ noted that, as a nurse practitioner, Baily's opinion is not afforded the same deference generally given to a treating source opinion because nurse practitioners are not considered medically qualified treating sources. (Tr. 30); 20 C.F.R. §§ 404.1513(a), 416.913(a). Nevertheless, such opinions can help to demonstrate the severity of a claimant's conditions and his or her functional limitations. *See* 20 C.F.R. §404.1513(d)(1); Soc. Sec. Ruling 06-03p, 2006 SSR LEXIS 5, 2006 WL 2329939 (2006). The ALJ, however, dismissed her opinion not only because he found she was not qualified to give it, but also because he believed it was based on hearsay, specifically on reports of Steckroth's mother, rather than on any direct clinical observation or examination. (Tr. 424). Steckroth argues that only one paragraph of nurse Baily's letter is based on reports of his mother. However, a majority of the letter appears to be based on second-hand information as opposed to personal observation of symptoms. (*Id.*).[3] In addition, the treatment records from Dr. Learner's office make scant mention of Steckroth's psychological symptoms during appointments, and thus

---

[3] For example, nurse Baily states that Steckroth was only able to maintain gainful employment and make $9000 as a construction laborer because his mother got him out of bed every day and drove him to work. (Tr. 424). Similarly, she writes that Steckroth's parents attending his college classes is what kept him enrolled in the courses. (*Id.*). Finally, she notes that he has a risk for injury in the workplace, and quotes his mother regarding what his auditory hallucinations tell him to do. (*Id.*).

do not support the statements in nurse Baily's letter.  (Tr. 385-394).  Based on the record as a

whole, the court finds that the ALJ's decision to afford these three opinions no weight is

supported by substantial evidence.[4]

        *3.    New Evidence*

Steckroth argues that the September 29, 2010 letter from the general manager at Marco's

Pizza, Doc. 11, Ex. 1, is new and material evidence, and this case should be remanded to the ALJ

pursuant to sentence 6 of the Act so that he can consider it.  The court disagrees.  Remand to

consider new evidence is appropriate only when the evidence is material, and good cause is

shown as to why it was not presented at the prior proceeding.  42 U.S.C. § 405(g); *Willis v. Sec'y*

*of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  New evidence is "material" if

there is "a reasonable probability that the [Commissioner] would have reached a different

disposition of the disability claim if presented with the new evidence."  *Sizemore v. Sec'y of*

*Health & Human Servs*., 865 F.2d 709, 712 (6th Cir. 1988).  "Good cause" requires the claimant

to demonstrate "a reasonable justification for the failure to acquire and present the evidence for

inclusion in the hearing before the ALJ."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002).

Here, Steckroth has satisfied neither prong.  Although Steckroth was working for

Marco's Pizza at the time of the hearing, the letter is dated a year after the ALJ's decision, and it

fails to specify when Steckroth was terminated.[5]  Thus, it is unclear whether this letter could

have been procured before the ALJ issued his decision.  But even if it could not have been,

---

[4] The court notes, with regard to the opinions of the state agency psychologists, that the ALJ
erred when he stated that their opinions were based on "the record as a whole" as it is clear that
their opinions were issued in October and November 2006.  However, after considering the
entire record, and finding that, except for a small hiccup in the fall of 2008, Steckroth's condition
continued to improve from the date of those opinions, the court finds no error in the ALJ's
decision to rely on them.

[5] In fact, the September 2010 letter states that Steckroth was terminated "some time ago."

Steckroth has not demonstrated that the letter is material.  As the Commissioner points out, it is impossible to tell if the problems the led to Steckroth's termination were also experienced by him during the period covered by the ALJ's opinion (*i.e*, through the hearing date), or if Steckroth experienced a later relapse that contributed to his being terminated.  Such a later relapse has no bearing on the question of Steckroth's condition during the time period at issue in this case.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003) *quoting Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial").  And, the letter itself is vague and conclusory, merely stating that Steckroth had an "inability to successfully perform the duties required of a delivery person."  Without more meaningful information as to the timing or reasons for Steckroth's termination, it is highly unlikely that the ALJ would have altered his decision had the letter been available to him.  Therefore, remand pursuant to sentence 6 of the Act is not warranted.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Steckroth's Motion for Summary Judgment [11] be DENIED, the Commissioner's Motion [14] be GRANTED and this case be AFFIRMED.

Dated: March 2, 2012                          s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a

waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 2, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager