UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT STECKROTH, III,

       Plaintiff,                     Civil Action No. 11-10473

v.                                   Honorable Thomas L. Ludington

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

**OPINION AND ORDER OVERRULING PLAINTIFF'S OBJECTIONS, ADOPTING MAGISTRATE JUDGE GRAND'S REPORT AND RECOMMENDATION, GRANTING THE COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND AFFIRMING THE COMMISSIONER'S DECISION**

Plaintiff Robert Steckroth ("Steckroth") filed a complaint on February 7, 2011, pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which were referred to Magistrate Judge David Grand for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Judge Grand issued a report and recommendation on March 2, 2012, recommending that the Commissioner's motion for summary judgment be granted, that Steckroth's motion be for summary judgment be denied, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be affirmed.

Steckroth filed an objection to Judge Grand's report and recommendation on March 16, 2012. Steckroth contends that Judge Grand engaged in impermissible post hoc rationalizations in reviewing the ALJ's opinion, and his conclusions were thus based on his own rationalizations for the ALJ's findings, not based upon findings rendered by the ALJ. Steckroth also objects to Judge

Grand's conclusion to not recommend that the matter be remanded pursuant to sentence six of 42 U.S.C. § 405(g), since evidence submitted to the Appeals Council was both new and material.

The district court will make a "de novo determination of those portions of the report . . . to which objection is made." *Lardie v. Birkett*, 221 F. Supp. 2d 806, 807 (E.D. Mich. 2002)  De novo review in these circumstances requires at least a review of the evidence before the Magistrate Judge; the Court may not act solely on the basis of a Magistrate Judge's Report and Recommendation. *See* 12 Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 3070.2 (1997); *see also Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir. 1981). The Court may supplement the record by entertaining additional evidence, but is not required to do so. 12 Wright, Federal Practice § 3070.2. After reviewing the evidence, the Court is free to accept, reject, or modify the findings or recommendations of the Magistrate Judge. *See Lardie*, 221 F. Supp.2 d at 807. If the Court accepts a Report and Recommendation, it is not required to state with specificity what it reviewed; it is sufficient for the Court to state that it engaged in a de novo review of the record and adopts the Report and Recommendation. *See id.*; 12 Wright, Federal Practice § 3070.2.The Court is not obligated to further review the portions of the report to which no objection was made.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).  For the reasons stated below, Steckroth's objections will be overruled and Judge Grand's report and recommendation will be adopted.

## I

The background and procedural history included in the report and recommendation are as follows:

### A.    Procedural History

On June 21, 2006, Steckroth filed an application for DIB, alleging disability as of December 31, 2002. (Tr. 118-123). The claim was denied initially on November 3, 2006. (Tr. 76-80). Thereafter, Steckroth filed a timely request for an

administrative hearing, which was held on February 24, 2009, before ALJ Terry Miller. (Tr. 33-72). Steckroth, represented by attorney Laurie Sadhnick, testified, as did Steckroth's mother, Jeri Ann Steckroth, and vocational expert ("VE") Amy Kushbob. (Id.). On June 23, 2009, the ALJ found that Steckroth was not disabled. (Tr. 20-32). On December 9, 2010, the Appeals Council denied review. (Tr. 1-4). Plaintiff filed for judicial review of the final decision on February 7, 2011. [1].

## B.    Background

While the ALJ determined that Steckroth suffered from three severe impairments: paranoid schizophrenia, attention deficit hyperactivity disorder and a history of alcohol abuse, Steckroth's motion challenges only the ALJ's findings and analysis related to his paranoid schizophrenia. Thus, the court will focus only on the background relevant to that condition.

### 1.    Disability Reports

In a disability function report filed on June 21, 2006, Steckroth alleged that the following conditions prevented him from maintaining employment: paranoid schizophrenia and Tourette's syndrome. (Tr. 165). He reported that he was paranoid that people were "out to get" him, or that his food was "being poisoned." (*Id.*). He also reported that he had to "figure out 'good' and 'bad' voices." (*Id.*). He reported that co-workers were "jealous of [him] because [he] know[s] so much more than they do," and that bosses would fire him because his co-workers did not like him. (*Id.*). Steckroth reported having started "at least 11 jobs in 2005" and that his jobs "never lasted more than a few days to weeks." (*Id.*). He reported being treating with Risperdal injections for his schizophrenia. (Tr. 169).

In a function report dated September 8, 2006, Steckroth reported that he lived with his family in a house and that his daily activities consisted of playing on the computer, pulling weeds out of the garden, watching television and preparing food. (Tr. 172-73). He would perform numerous chores such as washing dishes, vacuuming, cleaning his room and cleaning the basement, although he needed daily reminders to do these things. (Tr. 173-74). He also attended church and performed community service on a horse farm. (Tr. 176). He reported being able to go out alone, although at the time he did not drive because, he reported, he did not "have a working car." (Tr. 175). However, he also reported needing someone to accompany him when he went out. (Tr. 176). Steckroth reported being unable to pay bills, handle a savings or checking account, though he could count change. (*Id.*). He reported needing to be reminded to take his medication. (Tr. 174). He reported having difficulty talking, hearing, concentrating and following instructions, elaborating, "It is hard to communicate with people." (Tr. 177). He reported that he had been fired or laid off because of problems he had with other people, stating "It is hard to keep a job." (Tr. 178).

-3-

In a work history report filed by Steckroth's mother and guardian, Jeri Steckroth, she confirmed that Steckroth had eleven jobs in 2005, stating that "most jobs were very short lived," and that Steckroth "just can't hold a job for any period of time." (Tr. 187). In a third-party function report[] filed the same day, Jeri Steckroth confirmed most of what Steckroth himself had reported. (Tr. 188-95). In addition, she reported that he was noncompliant with oral medication and received injections as a result. (Tr. 190). She reported that he could go out alone, and that he did drive, in addition to walk. (Tr. 191). She reported that Steckroth tended not to finish what he started, and that his illness has affected his transition to adulthood, including his social life. (Tr. 192). She reported he had no friends, cannot take instruction well, and is "very impulsive and unrealistic." (Tr. 193). She reported in addition to paranoia, Steckroth suffered from auditory hallucinations and delusions of grandeur. (Tr. 194). Jeri Steckroth reported that she and her husband had been appointed guardians of Steckroth "because [he] is unable to care for himself." (Tr. 195).

In a disability appeals report filed on April 3, 2007, Steckroth noted that he was receiving therapy for his condition. (Tr. 201-202). He reported that while he is able to care for his "activities of daily living," he "cannot support [himself] or maintain living quarters," stating that his parents support and care for him. (Tr. 203).

### 2.   Plaintiff's Testimony

Steckroth testified that he has always lived with his parents. (Tr. 39). He had a license and was able to drive and go places by himself. (Tr. 59). He completed a GED in 2000 and since had been taking college courses on and off in computers, welding, heating and cooling, and math. (Tr. 39-40). He obtained mostly Bs and Cs in his courses. (Tr. 41). Steckroth testified that he helped around the house, including indoor and outdoor chores. (Tr. 59). He no longer maintained a bank account because he had been the victim of a Nigerian check scam and owed "everyone." (Tr. 59-60). He attended church with his parents weekly, but did not engage in the church community or any other social community outside of services. (Tr. 60). Steckroth testified he was diagnosed with paranoid schizophrenia, which resulted in him having to "live life constantly battling [him]self, screaming at [him]self." (Tr. 46). He testified that he would drift of[f] in the middle of a task, or have difficulty getting motivated. (*Id.*).

Steckroth testified that his mother gives him Risperdal injections every two weeks, a medication prescribed by his psychiatrist. (Tr. 47). He testified that he had seen two different psychiatrists, Dr. Haque and Dr. Campbell, but that who he "really" saw was his therapist, John Roberts. (Tr. 48). He had previously been discharged from treatment when Roberts felt that he was getting better, but then returned to therapy because his mother "felt [he] needed to go back." (Tr. 48-49). Although Steckroth testified that "it's hard for [him] to go to therapy," he answered "yes" when asked whether seeing Roberts helped him have a better outlook. (Tr. 49). Steckroth testified that he had a hard time around other people because he tended to

-4-

get paranoid; he felt like he was being poisoned and was always looking over his shoulder. (Tr. 49; 51). He testified having one friend from work, who he sees and speaks to on a regular basis, and another friend, who he had known since he was a teenager, who he saw a couple of times a month. (Tr. 50; 58). He testified that he did not engage in any activities with either of these friends, however. (Tr. 51). When he was not working, he regularly watched television, played on the computer and talked to himself. (Tr. 54). He did not read because his mind would "be hearing things" and "it's hard to focus." (Tr. 56).

Steckroth testified that he had auditory hallucinations, and that when he went to bed it was sometimes "kind of scary, loud and scary every now and then." (Tr. 56). He testified he had accepted the voices as part of his life and that he did not hear them all the time, though recently he had been experiencing panic attacks and voices telling him he was going to die. (Tr. 57). When the voices were bad, they sounded like 'constant gibberish all day" making him want to "strangle some imaginary thing." (Tr. 58).

Steckroth testified that at the time of the hearing he was working about eight hours a week delivering pizzas. (*Id.*). He worked a couple of days a week for two to three hours a day. (Tr. 54). Steckroth testified that he had no trouble finding the homes of his customers or engaging in the financial transaction related to the sale. (*Id.*). He testified that he had had a number of jobs was the he felt people would turn on him or he would get paranoid and stop trusting people. (Tr. 42). Steckroth testified that he usually quit his jobs. (*Id.*).

### 3.   Plaintiff's Mother's Testimony

Steckroth's mother, Jeri, testified that she had been Steckroth's legal guardian for almost three years and that she was not planning on giving up guardianship. (Tr. 63). She testified that she made sure Steckroth did his homework and went to his therapy appointments. (Tr. 63-64). She attended appointments periodically. (Tr. 64). She made sure he was neat and clean because he was often disheveled and disorganized. (*Id.*). Jeri Steckroth and her husband attended some of Steckroth's college classes "to get him on track" as he "seemed to do better and more consistent with us there." (*Id.*). She testified that she did not, however, take Steckroth to his current job as a pizza deliverer, as "he's been on medication." (*Id.*). Prior to the medication, she would take him to and from his jobs, and when he lost jobs she would find out why he was let go. (*Id.*). She testified that Steckroth had been fired from "many, many, many jobs." (*Id.*).

Jeri Steckroth testified that Steckroth did not engage with his therapist and, at one point, his therapist felt that he had helped Steckroth all he could and suggested terminating therapy, to which Jeri Steckroth agreed. (Tr. 65). However, she later felt he needed continued therapy after he began experiencing paranoia that he was dying. (Tr. 65-66). She also testified that Steckroth experiences a paranoia that people are poisoning him. (Tr. 66). She testified that Steckroth did not want to be in therapy. (*Id.*).

-5-

Jeri Steckroth testified that Steckroth was able to go out by himself, but that she did not know what he did when he went out. (Tr. 68). She testified that without his parents, he would likely be homeless. (*Id.*).

### 4.    Medical Evidence

#### a.    Treating Sources

Steckroth was first examined by the Oakland Psychological Clinic in February 2006. (Tr. 230-36). At the time he was assessed with a global assessment of functioning ("GAF") score of 40, meaning he demonstrated some difficulty in reality testing or communication or he had a major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. (Tr. 233); *see* DSM-IV-TR, at 34 (July 2000). The examiner, therapist Nancy Wrobel, found that Steckroth had difficulty with impulse control, and impaired insight and judgment and that these things interfered with his daily activities, for example, employment. (Tr. 231; 233). She diagnosed him with ADHD and Tourette's, but noted that he needed to complete a psychiatric evaluation and psychological testing. (Tr. 234-35). In her full psychological evaluation, Wrobel noted that Steckroth reported delusions of persecution and auditory hallucinations, which sometimes included commands. (Tr. 420). Wrobel determined that Steckroth had difficulty concentrating, and his wide ranging achievement test scores revealed a wide discrepancy between reading and math, with reading at a high school level and math at a sixth grade level. (Tr. 420). She noted that on his Minnesota Multiphasic Personal Inventory test ("MMPI-2") he tendered deviant responses; admitting to serious psychological problems while at the same time naively attempting to appear well adjusted. (*Id.*). She noted that individuals with similar profiles had difficulty with interpersonal relationships and were unlikely to cooperate in therapy. (Tr. 420-421).

Psychological testing revealed paranoid ideation and auditory hallucinations, and Wrobel referred Steckroth to Dr. Haque, a psychiatrist, for an evaluation. (Tr. 268). On April 6, 2006, Dr. Haque diagnosed him with paranoid schizophrenia and started him [on] Abilify. (Tr. 265-67). At his next appointment, on April 20, 2006, Dr. Haque noted that Steckroth had quit his pills a few days after starting treatment, alleging that the voices began screaming at him. (Tr. 264). Dr. Haque increased Steckroth's Abilify dosage. (*Id.*). On that same date, Dr. Haque wrote a "To Whom It May Concern" letter regarding Steckroth's condition. (Tr. 417). Dr. Haque noted Steckroth's history and his symptoms, and stated "[h]is prognosis for recovery from this condition is extremely guarded due to the pervasive and chronic nature of his condition." (*Id.*). He certified, via a form, that Steckroth was permanently disabled in that his condition prevented him from engaging in substantial gainful activity. (Tr. 418). At an appointment on May 3, 2006, Steckroth reported taking the Abilify for a week and quitting again, stating that he felt well and did not need the medication. (Tr. 262). Dr. Haque changed his medication to Risperdal injections once every two weeks. (*Id.*).

At an appointment on June 14, 2006, Dr. Haque noted Steckroth had taken two injections so far, and that his mother had reported Steckroth was less anxious. At an appointment on August 9, 2006, Steckroth reported feeling "okay" on the medication, except that he got tired. (Tr. 250). At an October 11, 2006, appointment, Steckroth reported no new symptoms, and that he was able to focus on his new job as a machine operator. (Tr. 241). Jeri Steckroth also reported not having seen any psychosis. (*Id.*). At an appointment on January 31, 2007, Jeri Steckroth reported that her son was "doing very well." (Tr. 329). At that point, Steckroth again denied any auditory hallucinations. (*Id.*). Dr. Haque continued the Risperdal. At an appointment on March 24, 2007, Steckroth denied having auditory hallucinations, and reported that his mood was stable and that he was sleeping well. (Tr. 326). Dr. Haque described Steckroth's progress toward his goals as "fair." (*Id.*). At an appointment on May 19, 2007, Steckroth reported feeling well, with no hallucinations and that he was getting along with his co-workers at his new job at a newspaper plant. (Tr. 322). Dr. Haque noted Steckroth's progress as "good." (*Id.*). Steckroth stopped seeing Dr. Haque in August 2007, after his mother began getting his medication from the family's primary care physician. (Tr. 317).

Steckroth was next evaluated by psychiatrist Dr. Lisa Campbell in November 2008, after his therapy case was reopened. (Tr. 299). Dr. Campbell noted that Steckroth had been taking his Risperdal injections every two weeks. (Tr. 297). She noted he was still hearing voices, but that he reported them as "mostly cheerful" thoughts which he did not mind, that they were part of his life so he did not feel bothered by them, however[,] he still felt that people were "out to get" him. (Tr. 296). Dr. Campbell found Steckroth to be "a good natured, occasionally smiling, spontaneous, open young adult," and noted unremarkable psychomotor behavior and no suicidal or homicidal ideation. (Tr. 297). However, she found his memory and insight to be poor. (*Id.*). She assessed him a GAF score of 52 and gave him a "guarded" prognosis. (Tr. 298).

At an appointment on November 17, 2008 Steckroth reported having hallucinations, but that they were not bothersome. (Tr. 294). Dr. Campbell noted satisfactory progress. (*Id.*). On that same day, Dr. Campbell wrote a letter to Steckroth's primary care physician, Dr. Learner, noting that Steckroth was "an earnest, cooperative young man, who admits to having hallucinated voices, mostly cheerful and not at all troubling." (Tr. 408). She felt that the Risperdal was keeping Steckroth "in good control" and that she did not feel a need to continue treatment as Dr. Learner was "treating him quite properly." (*Id.*). At the final appointment in the record, on December 15, 2008, Steckroth reported that his hallucinations were under control. (Tr. 290). She found him "open, rational, restrained, timid and eurythmic," and noted satisfactory progress. (*Id.*). However, in a letter to Steckroth's attorney dated February 4, 2009, Dr. Campbell recommended that Steckroth's "condition is severe enough to prevent him from working, due to his hallucinations and paranoid state of mind." (Tr. 422). She did not provide any supporting statements or evidence for this opinion.

Therapist John Roberts began treating Steckroth in June 2006. (Tr. 255). At

an appointment in July 2006, Steckroth denied recently having any auditory hallucinations. (Tr. 254). In the beginning, Roberts notes reflect ebbs and flows in Steckroth's condition, exhibited by Steckroth's reports of hearing voices and having delusional thoughts that Roberts concluded "continue to affect [his] occupational and social functioning. (Tr. 238; 244; 246; 249). At an appointment on October 19, 2006, Steckroth appeared with a "blustered affect;" he had a "starved look "and "gazed into the air. (Tr. 238). While he reported still hearing voices, he stated that there was a "significant improvement." (*Id.*).

The conversation in Steckroth's next two appointments with Roberts focused on Steckroth's work, or lack thereof. (Tr. 333; 335). However, notes from the next few appointments show a marked improvement in Steckroth's condition, with Roberts noting that he "continue[d] to improve" and that he was "not hearing voices". (Tr. 321; 324-25 327-28). At one point Roberts noted that he found Steckroth "rational and engaged." (Tr. 321). On June 6, 2007, Roberts spoke with Jeri Steckroth about closing her son's case "in the near future." (Tr. 320). At the time she was agreeable to this. (*Id.*). However, at the next appointment, on June 27, 2007, there appeared to be a setback in Steckroth's condition, with increased paranoia and other symptoms of psychosis, and thus therapy continued. (Tr. 319).

At the next session on August 1, 2007, Steckroth's mother was present and expressed concerns for her son's wellbeing. (Tr. 317). She felt that it would be beneficial to continue therapy. (*Id.*). Roberts noted that Steckroth appeared discouraged and had low self-esteem. (*Id.*). He concluded that Steckroth's "disorder influences [his] decisions and efforts toward life events." (*Id.*). However, Roberts continued to note progress at the next few appointments and, after an appointment in February 2008, where Steckroth reported no psychoses and that he was doing well in college, Roberts again noted a desire to close his case (Tr. 307; 310-315). After speaking with Jeri Steckroth, on February 19, 2008, Roberts closed Steckroth's case, noting that "Risperdal injections have been very beneficial to help decrease hallucinations." (Tr. 306). Roberts found Steckroth "much improved." (*Id.*).

On October 28, 2008, Roberts reopened Steckroth's case, noting an uptick in paranoia and auditory hallucinations. (Tr. 301). Steckroth reported being afraid he was going to die. (*Id.*). Roberts assessed him and found that he had some denial issues regarding his diagnosis. (Tr. 302). However, he found him fully oriented, with a normal affect but a depressed mood, with impaired judgment and insight. (*Id.*). At an appointment on November 11, 2008, Steckroth reported hearing voices "every now and then" and that he was at counseling by choice. (Tr. 295). At an appointment on November 25, 2008, Steckroth reported getting through his college semester and that he had no hallucinations. (Tr. 293). He reported not wanting to be on medication. (*Id.*). Roberts noted that Steckroth had poor judgment regarding wanting to quit the medication. (*Id.*). At an appointment on December 9, 2008, Steckroth reported no hallucinations or delusions. (Tr. 291). At an appointment on December 16, 2008, Steckroth reported no hallucinations and Roberts noted he was pleasant and engaged during the session. (Tr. 289). Roberts found he had improved his responsibility and that Steckroth continued to see himself improve. (*Id.*).

Steckroth also produced treatment records from his primary care physician, Dr. James Learner, M.D., from May 2006 until January 2009. (Tr. 385-93). At first, Dr. Learner recorded some of Steckroth's paranoid schizophrenia symptoms and began administering Steckroth's Risperdal injections in 2007. (Tr. 392-93). Steckroth reported that he was feeling great and happy and that the medicine was "great." (Tr. 392). As time went on, Dr. Learner recorded few symptoms, dealing mostly with Steckroth's physical complaints including a head cold and pain. (Tr. 388-91). Dr. Learner continued to prescribe Risperdal. (Tr. 385-93). Dr. Learner's nurse practitioner, Deborah Bailey, wrote a "To Who It May Concern" letter on February 12, 2009, stating that she had been caring for Steckroth since May 2006, and that his disability has interfered with his ability to sustain employment and support himself. (Tr. 424). She noted that Steckroth hears voices and believes people are trying to poison him, and that he also exhibits grandiose behavior. (*Id.*). She documented that Steckroth's mother was the reason he had gotten to work every day, as she woke him up and drove him. (*Id.*). Nurse Bailey concluded that Steckroth was unable to support himself and should be granted disability. (*Id.*).

### b.  Consultative and Non-Examining Sources

Steckroth attended a consultative examination with Dr. John Jeter, a limited license psychologist and clinical social worker, on October 17, 2006. (Tr. 223-26). Dr. Jeter noted that Steckroth arrived for the appointment accompanied by his mother, who drove him. (Tr. 223). Steckroth reported auditory hallucinations about six times a day, but that his medication for his paranoid schizophrenia was "working very well." (Tr. 223; 225). He noted that, for the last two weeks, Steckroth had been working 36 hours a week "with success." (Tr. 225). Dr. Jeter found Steckroth's thoughts logical, organized, simple and concrete. (Tr. 225). He noted that Steckroth responded well to instructions and did not require them to be repeated. (Tr. 224). Eye contact was good, though Steckroth was minimally verbally responsive and guarded with his answers and his contact with reality was faulty. (*Id.*). Dr. Jeter noted that Steckroth's wide ranging aptitude test scores had increased since he was tested in March 2006. (Tr. 225). He found that Steckroth "presented as stable" and his medication "appear[s] to be controlling his impulsive behavior." (Tr. 226). He assessed Steckroth with a GAF score of 62. (*Id.*).

On November 2, 2006, Dr. Rom Kriauciunas, Ph.D., reviewed Steckroth's records to date and produced an RFC assessment. Dr. Kriauciunas diagnosed Steckroth with paranoid schizophrenia, but found it well managed by medication. (Tr. 273). He determined that Steckroth had mild restriction in activities of daily living and moderate difficulties on maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 281). He found that Steckroth suffered from one or two episodes of decompensation. (*Id.*). Dr. Kriauciunas labeled Steckroth as "moderately limited" in six out of twenty categories, including his ability to understand, remember and carry out detailed instructions, his ability to interact with the public and his ability respond appropriately to workplace changes. (Tr. 285-86).

-9-

Based on this, he concluded Steckroth remained capable of performing unskilled work on a sustained basis. (Tr. 287).

### 5.   Vocational Expert's Testimony

VE Amy Kushbob testified in response to a hypothetical that based on Steckroth's age, education, work history and RFC assessed by the ALJ which included no exertional limitations, but included limiting him to simple routine tasks consistent with unskilled work, only occasional interpersonal interactions with the general public, supervisors and co-workers, and only occasional changes in the work setting, that Steckroth could continue to perform his past relevant work as a pizza deliverer. (Tr. 70). Other jobs that would fit this hypothetical would include dining room attendant, kitchen helper, and laundry worker. (Tr. 71). The ALJ then asked the VE to include the additional limitation of an inability to sustain even simple routine tasks on a consistent basis due to interruptions from psychologically-based symptoms, namely auditory hallucinations. (*Id.*). The VE testified that such a limitation would preclude both past work and other work. (*Id.*).

### 6.   Other

In his appeal of the ALJ's decision to the Appeals Council, Steckroth included a letter, dated September 29, 2010 from his former general manager at Marco's Pizza, the job he had held at the time of the ALJ hearing. (Doc. # 11, Exh. 1).1 The general manager wrote that Steckroth's employment with the company "stopped some time ago, due to his inability to successfully perform the duties required of a delivery person, even on a part time basis." (*Id.*).

### C.   Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful

-10-

activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) citing 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Steckroth was not disabled because he was able to engage in his prior relevant work as a pizza deliverer. (Tr. 30). At Step One, she found that Steckroth had not engaged in substantial gainful activity since December 31, 2002. (Tr. 25). At Step Two, she determined that Steckroth's severe impairments included paranoid schizophrenia, attention deficit hyperactivity disorder, and a history of alcohol abuse. (Tr. 25). At Step Three, she concluded that Steckroth's severe impairments, either alone or in combination, did not meet or medically equal a listed impairment under either listing 12.03 or 12.08. (Tr. 25-26). She determined that Steckroth had mild restriction in activities of daily living, moderate difficulties in social functioning and concentration, persistence and pace, and no episodes of decompensation of extended

-11-

duration. (Tr. 26-27). Next, the ALJ assessed Steckroth's RFC. She found he had the RFC to perform:

> a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, routine, repetitive tasks consistent with unskilled work; with only occasional interpersonal interactions with the general public, co-workers, and supervisors; and only occasional changes in the work setting.

(Tr. 27). The ALJ then determined that Steckroth had worked as a pizza deliverer on a repeated basis within the last 15 years, long enough to learn the job's duties. (Tr. 30). Based on this RFC, coupled with his age, education and work history, the ALJ concluded Steckroth was capable of performing his past relevant work as a pizza deliverer and thus he was not disabled under the Act. (*Id*.).

## II

### A

Steckroth's first objection to the report and recommendation is that Judge Grand engaged in impermissible post hoc rationalizations in reviewing the ALJ's opinion, thus basing his conclusions not upon findings rendered by the ALJ but instead upon his own rationalizations for those findings. The Court is charged with determining whether the findings of fact and law actually rendered by the ALJ are supported by substantial evidence. 42 U.S.C. § 405(g). The Court is not permitted to substitute its own reasoning for that of the ALJ or render its own independent findings, as this constitutes inappropriate "post hoc rationalization." *Hyatt Corp v. NLRB*, 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order. . . . [nor is the court] free to accept 'appellate counsel's rationalization for agency action in lieu of reasons and findings enunciated by the Board.' ") (citations omitted).

### 1

First, Steckroth notes that the ALJ did not give any weight to the opinions of his treating physician, Dr. Campbell, who opined that Steckroth was unable to work "due to his hallucinations

-12-

and paranoid state of mind" Admin. Record 422. The ALJ reasoned that, although Dr. Campbell stated that Steckroth could not work, he had been working at times. Admin. Record 30. In addition, the ALJ stated that Dr. Campbell had only treated Steckroth for three months after a break in treatment, and did not refer to any treatment notes, clinical observations, or psychological testing. *Id.* Steckroth contends that Judge Grand instead offered his own reasons for according Dr. Campbell's opinion no weight, even while referring to Dr. Campbell's treatment notes:

> Furthermore, Dr. Campbell's treatment notes from around the same time contradict her letter. (Tr. 290; 294; 296-98). They note continued improvement in Steckroth's condition, consistent with his return to therapy, so much so that she proposed to his primary care physician, Dr. Learner, that her services were no longer needed, citing the fact that the medication was "keeping him in good control" and suggesting that Dr. Learner could handle Steckroth's care alone. (Tr. 408). In the same letter, Dr. Campbell stated she found Steckroth to be "earnest" and "cooperative" and whose voices were "mostly cheerful and not at all troubling." (*Id.*) Dr. Campbell's characterization of Steckroth's condition, coupled with her belief that he no longer needed a psychiatrist is inconsistent with her conclusion that his condition was disabling. Therefore, the ALJ's decision not to credit Dr. Campbell's conclusory opinion finding Steckroth disabled is supported by substantial evidence.

ECF No. 17 at 21-22. Although this rationale could have provided a sufficient basis for rejecting Dr. Campbell's opinion, Steckroth emphasizes that it was not the ALJ's basis for rejecting the opinion. Instead, Steckroth submits that this represents the Judge Grand's independent rationalization for that result and is error. *Hyatt Corp.*, 939 F.2d at 367.

Although Judge Grand provided the additional explanation highlighted in Steckroth's objections for why the ALJ may have given no weight to Dr. Campbell's opinion, Judge Grand first concluded that the ALJ had the right to disregard Dr. Campbell's opinion because her conclusory statement was not supported by any explanation or evidence. *See Anderson v. Comm'r of Soc. Sec.*, 195 F. App'x 366, 370 (6th Cir. 2006) (approving that ALJ's dismissal of a conclusory treating physician opinion when unsupported and inconsistent with treatments notes). Because this provided

-13-

a sufficient basis for the ALJ rejecting Dr. Campbell's opinion, Judge Grand's subsequent additional rationale does not require remand to the ALJ for additional consideration. Steckroth's objection will be overruled.

**2**

Second, Steckroth notes that the ALJ rejected the opinions of Deborah Bailey, a nurse practitioner, because she was not an acceptable medical source and because her testimony constituted hearsay. Admin. Record 30. Steckroth noted in his summary judgment motion that even the opinions of someone who is not an acceptable medical source may be considered with regard to the severity of the claimant's condition and its impact upon his or her ability to work, citing 20 C.F.R. § 404.1513(d). Steckroth additionally noted that agencies are able to relax the rules of evidence when evaluating technical evidence. *Richardson v. Perales*, 402 U.S. 389 (1971); *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001).

Steckroth argues that Judge Grand confirmed that Nurse Bailey's opinions are, at least in part, based upon hearsay but did not respond to Steckroth's argument that this was nonetheless permissible evidence to consider. Consequently, this issue still requires resolution. The *Perales* case makes clear that the normal rules of evidence do not govern Social Security hearings. *Smereczynski v. Secretary, Dept. of Health and Human Services*, 944 F.2d 296, 298 (6th Cir. 1991). Nonetheless, the common law bars hearsay not for technical, legalistic reasons but rather because such evidence is often unreliable. *Id.* The ALJ concluded that because Nurse Bailey's reports were not based on direct personal observations of the claimant's symptoms, but instead based on hearsay reports from others, it would be given no weight.  Although relevant hearsay is often admissible in Social Security hearings,  *Smereczynski*, 944 F.2 at 298, there is nothing to suggest that Nurse Bailey's

opinions based on inadmissible hearsay were otherwise reliable such that the ALJ erred in deciding to give Nurse Bailey's opinion no weight.

In addition, Steckroth contends that Judge Grand offered his own reason for rejecting the opinions of Nurse Bailey that were not reasons utilized by the ALJ towards that end. ECF No. 17 at 23 ( "In addition, the treatment records from Dr. Learner's office make scant mention of Steckroth's psychological symptoms during appointments, and thus do not support the statements in nurse Baily's [sic] letter.") (citing Tr. 385-94). Steckroth argues that Judge Grand again relied on impermissible post hoc rationalization and not on the conclusions of the ALJ and remand is appropriate to determine if this is an adequate basis for rejecting Nurse Bailey's opinions. Because the ALJ's decision to afford Nurse Bailey's decision no weight is adequately based on the ALJ's conclusion that she was not an acceptable medical source in addition to the fact that her opinions were based on hearsay reports from others, Judge Grand's additional observations do not require remand to the ALJ for additional consideration. Steckroth's objection will be overruled.

**3**

Finally, Steckroth also contested the ALJ's reliance upon the opinions of the State agency psychologists, particularly since one only examined him once and the other never observed him at all, yet their opinions were being elevated above those of the treating physicians contrary to SSR 96-2p. Instead, the ALJ noted only that "it was the opinion of the State agency psychologists after reviewing the record as a whole that the claimant experienced improvement in his mental conditions and was capable of performing simple tasks that had limited social contacts since the application date (Exs. 5F, 6F)" Admin. Record 30.

Steckroth asserted in his motion for summary judgment that these agency psychologists had

not actually reviewed the whole record, and, in fact, had not seen any records for a period of more than two years prior to the hearing. Judge Grand agreed with this assertion: "The court notes, with regard to the opinions of the state agency psychologists, that the ALJ erred when he stated that their opinions were based on 'the record as a whole' as it is clear their opinions were issued in October and November 2006." ECF No. 17 at 23 n.4. However, Judge Grand continued by excusing the error by offering an alternative basis for the result reached: "However, after considering the entire record, and finding that, except for a small hiccup in the fall of 2008, Steckroth's condition continued to improve from the date of those opinions, the court finds no error in the ALJ's decision to rely on them." *Id.* Steckroth argues that this likewise constitutes Judge Grand offering his own "rationalization for agency action in lieu of reasons and findings enunciated by the [ALJ]." *Hyatt Corp.*, 939 F.2d at 367. Steckroth argues that it is the ALJ's responsibility to properly support his conclusions, and remand on this issue is thus appropriate.

As Steckroth noted in his motion for summary judgment, Courts have consistently held that the opinions of a treating physician are entitled to greater weight than contrary opinions from a consulting physician who only examined the claimant on one occasion. *See, e.g.*, *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *Farris v. Sec'y of HHS*, 773 F2d 85, 90 (6th Cir. 1985); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The opinions of non-examining physicians are accorded even less weight. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Walker v. Sec'y of HHS*, 980 F.2d 1066, 1071-72 (6th Cir. 1992). The ALJ, however, chose to rely upon one psychologist, Dr. Jeter, who only examined Steckroth once, and another psychologist, Dr. Kriauciunas, who did not examine Steckroth, concluding that because their opinions were rendered after "reviewing the record as a whole," their decisions would be afforded

-16-

greater weight. Both state agency psychologists rendered their reports in 2006, but the record contains evidence for more than two years following these opinions.

Although the ALJ erred in observing that the state agency psychologists based their opinions upon the record as a whole, Judge Grand did not provide an impermissible post-hoc rationale in concluding that this did not constitute reversible error. Instead, the court must determine whether the Commissioner's decision is supported by substantial evidence and, if so, it must be affirmed. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Judge Grand's observation did not provide an alternative basis for the result reached by the ALJ, but instead concluded that there was substantial evidence in the record to support the decision despite the fact that the state agency psychologists' opinions did not include a review of post-2006 evidence. Steckroth's objection will be overruled.

**B**

Steckroth's second objection is to Judge Grand's conclusion that remand pursuant to sentence six of of 42 U.S.C. § 405(g) is not appropriate because new and material evidence was submitted to the Appeals Council. However, evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review unless it relates to the period on or before the date of the ALJ's decision. *Cline v. Comm'r of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996); 20 C.F.R. § 404.970(b). The Sixth Circuit has not concluded that the materiality of evidence, for the purpose of remand under § 405(g), is controlled by whether the Appeals Council considered the evidence when it declined review. Rather, the Sixth Circuit undertakes an independent assessment of whether evidence the plaintiff did not submit to the ALJ is "material." *See, e.g.*, *Hollon v. Comm 'r of Soc. Sec.*, 447 F.3d 477, 481, 483-84 (6th Cir.

-17-

2006).

In his decision, the ALJ based his finding that Steckroth could work in part upon the fact that he "had been working part time delivering pizzas since January 2009." Admin. Record 31. This was Steckroth's testimony at the hearing, which was conducted in February 2009, only a few weeks after he had started the job. Admin. Record 41, 54. The ALJ concluded that this testimony required a finding that Steckroth was not entitled to benefits because he was "capable of performing past relevant work as a pizza deliverer." Admin. Record 30.

Steckroth subsequently submitted a September 10, 2010, letter from his supervisors at this employer, Marco's Pizza, to the Appeals Council indicating that "[h]is employment with us stopped some time ago, due to his inability to successfully perform the duties required of a delivery person, even on a part time basis." ECF No. 18 Ex. 1. Steckroth emphasized in his motion for summary judgment that, while the Court may not render findings as to whether the ALJ's opinion should be upheld, reversed, or modified based upon evidence not previously considered by the ALJ, it may order that additional evidence be taken upon a showing that there is new evidence which is material, and that there is good cause for the failure to incorporate such evidence into the prior record. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). This directive is based upon sentence six of 42 U.S.C. § 405(g).

Steckroth argued that this letter was clearly new evidence, since it was not authored until well after the ALJ's decision and therefore could not have been submitted previously. In addition, he argued that it was material, in that it directly undercuts a significant basis for the ALJ's conclusion. Finally, he contends that there was good cause for failure to submit it sooner, because it did not previously exist. Judge Grand indicated that, "As the Commissioner points out [in its

-18-

motion for summary judgment], it is impossible to tell if the problems that led to Steckroth's termination were also experienced by him during the period covered by the ALJ's opinion (i.e. through the hearing date),or if Steckroth experienced a later relapse that contributed to his being terminated." ECF No. 17 at 24. Steckroth contends this observation is made in error because the Commissioner rendered no such finding in its determination to deny benefits but does not otherwise explain why the Commissioner's argument has no merit on review given that evidence of subsequent deterioration in a claimant's position is not relevant to the analysis. *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 685 (6th Cir. 1992).

Judge Grand further concluded that "[w]ithout more meaningful information as to the timing or reasons for Steckroth's termination, it is highly unlikely that the ALJ would have altered his decision had the letter been available to him." ECF No. 17 at 24. Steckroth contends that on the basis of this conclusion alone, remand is appropriate to permit the ALJ to obtain any additional explanation regarding the new evidence he might deem necessary. Steckroth submits that this Court thus should not leave intact a finding that he was capable of his past relevant work as a pizza deliverer, without requiring consideration of a new letter that demonstrates that he was not truly so capable.

As noted in the report and recommendation, remand to consider new evidence is appropriate only when the evidence is material, and good cause is shown as to why it was not presented at the prior proceeding. 42 U.S.C. § 405(g); *Willis v. Sec'y of HHS*, 727 F.2d 551, 554 (6th Cir. 1984). New evidence is "material" if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of HHS*, 865 F.2d 709, 712 (6th Cir. 1988). "Good cause" requires the claimant to

-19-

demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002).

Judge Grand concluded that Steckroth has satisfied neither prong. First, he notes that it is unclear whether the letter could have been procured before the ALJ issued his decision. Good cause, however, does not require a demonstration that the new evidence could not have been acquired before a *decision* is rendered, but that the evidence could have been acquired and presented in the *hearing* before the ALJ. As the record demonstrates, Steckroth was still employed by Marco's Pizza at the time of the hearing and he thus has provided a reasonable justification for why the letter could not have been included in the hearing before the ALJ. However, the fact that the evidence was not available as of the hearing date does not, on its own, demonstrate good cause. The unavailability of material evidence may, in some circumstances, demonstrate good cause, *see Wilson v. Sec'y of Health & Human Servs.*, 733 F.2d 1181, 1182–83 (6th Cir.1084), but not where, as here, the evidence is unavailable at the time of the hearing because it is not reflective of the applicant's condition at the time of the hearing. *See Sizemore*, 865 F.2d at 712. Steckroth thus has not satisfied the "good cause" requirement.

Even if the good cause requirement were satisfied, Steckroth provides no legal support for his contention that remand is required to permit the ALJ to obtain any additional explanation regarding the new evidence he might deem necessary to determine if the new evidence is material. A determination of materiality requires concluding that there is a reasonable probability that the new evidence itself—not any additional evidence or explanation that may subsequently be requested or provided— would have resulted in the Commissioner reaching a different conclusion. As Judge Grand observed, the letter did not include the timing or the specific reasons for Steckroth's

termination, nor is it clear whether the issues resulting in his termination were a result of a later relapse which would render the evidence immaterial.   Records that show a lack of improvement, which were created after the ALJ's disability determination, cannot be used to show disability existed at the time of the disability determination. *Sizemore*, 865 F.2d at 712; *see also Wasik v. Commissioner of Social Sec.*, No. 09-14933, 2011 WL 740686, at *6 (E.D. Mich. Feb. 24, 2011).

Moreover, the letter is not chronologically material, because it was completed over a year after the ALJ's decision. Thus, the letter constitutes evidence that is only minimally probative, and evidence must be more than minimally probative to achieve the materiality standard required for a sentence six remand.  *See Obeshaw v. Commissioner of Social Sec.*, No. 1:08-cv-559, 2010 WL 955613, at *1 (W.D. Mich. March 15, 2010). Therefore, the letter does not constitute new or material evidence and Steckroth's objections will be overruled.

### III

Accordingly, it is **ORDERED** that Plaintiff's objections (ECF No. 18) are **OVERRULED**.

It is further **ORDERED** that Judge Grand's report and recommendation (ECF No. 17) is **ADOPTED**.

It is further **ORDERED** that Plaintiff's motion for summary judgment (ECF No. 11) is **DENIED**.

It is further **ORDERED** that the Defendant's motion for summary judgment (ECF No. 14) is **GRANTED**.

It is further **ORDERED** that the decision of the Commissioner is **AFFIRMED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 30, 2012

-21-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 30, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS